**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PAMELA KIZIOR, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>HEALTH CARE SERVICE CORPORATION,<br><br>*Defendant.* | Case No. |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Pamela Kizior, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Health Care Service Corporation ("HCSC") to put an end to its unlawful disclosure of Plaintiff's and the proposed Class's protected health information. Upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, Plaintiff complains and alleges as follows:

**NATURE OF THE ACTION**

1. This is a class action against HCSC for violating Plaintiff's and the Class's privacy rights by disclosing Plaintiff's and other Blue Cross and Blue Shield of Illinois ("BCBSIL") plan members' personally identifiable information ("PII") and non-public protected health information ("PHI" and with PII, "Private Information") through the use of hidden tracking codes integrated by HCSC onto the BCBSIL website, https://www.bcbsil.com, and the related BCBSIL mobile application (together, the "BCBSIL Online Platform").

2. Specifically, in order to gain additional insights into its plan members, improve its return on its marketing spend and, ultimately, increase its revenue, HCSC encouraged Plaintiff and

Class Members to access and manage their health insurance benefits, and communicate with HCSC, on the BCBSIL Online Platform.

3. Plaintiff and Class Members who visited and used the BCBSIL Online Platform understandably thought they were communicating *only* with their trusted health plan.

4. Unbeknownst to Plaintiff and Class Members, however, HCSC embedded certain tracking technologies on the BCBSIL Online Platform—including tracking technologies offered by third parties Adobe, Medallia, Qualtrics, and Dynatrace ("Tracking Technology Vendors")—that automatically transmit to the technology provider confidential details about BCBSIL plan members and their communications with HCSC.

5. Operating as designed and as implemented by Defendant, the tracking technologies at issue in this case allowed the Private Information that Plaintiff and Class Members provided to Defendant to be unlawfully disclosed to the third-party tracking technology providers alongside unique and persistent identifiers that identify the plan member in a manner that violates federal and Illinois law.

6. By installing the tracking technologies, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private communications with Defendant, including sensitive and confidential health-related data, to the third-party tracking technology vendors. Those communications include plan member requests that identify (a) the BCBSIL plan member as a BCBSIL plan member, (b) the plan member's BCBSIL member number, (c) the plan member's Illinois Medicaid status, and (d) the types of claims and benefits subject to the communications.

7. This Private Information is, in turn, simultaneously intercepted by the tracking technologies and disclosed to the tracking technology vendors, who pair it with unique identifier(s)

connected to the individual plan member and use it to, among other things, create robust profiles for marketing purposes.

8. Plan members simply do not anticipate that their trusted health plan sends personal health information or confidential medical information collected via the BCBSIL Online Platform to any undisclosed third party without the plan members' informed and express consent.

9. Neither Plaintiff nor any other Class Member was provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to the third-party tracking technology providers.

10. The disclosure of Plaintiff's and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

11. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are ***not*** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent from each patient.

12. The Office for Civil Rights (OCR) at HHS has made clear, in a bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing***

> ***purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[1]

13. Similarly, the FTC also addressed these privacy concerns:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out***.[2]

14. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Defendant. For example, the primary document in which Defendant discusses its data privacy practices with respect to PHI is Defendant's HIPAA Privacy Notice, which states that Defendant "cannot use or disclose" PHI "to conduct marketing or for our financial benefit" without the informed consent of the affected plan member.

15. Furthermore, even putting the HIPAA Notice aside, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

16. Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure the BCBSIL Online Platform was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share plan members' information; (iii) failing to obtain the consent of

---

[1] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 21, 2026) (rev. Mar. 18, 2024) (emphasis added).

[2] Elisa Jillson, *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, FTC Business Blog (July 25, 2023) (emphasis added).

Plaintiff and Class Members to disclose their PII and PHI to the third-party tracking technology vendors; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the tracking technologies; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor the BCBSIL Online Platform to maintain the confidentiality and integrity of plan member PII and PHI.

17. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct; these injuries include: (i) invasion of privacy, (ii) intrusion upon seclusion, (iii) loss of benefit of the bargain, (iv) compromise and disclosure of Private Information and identities, (v) violations of statutory rights and related statutory damages, and (vi) the continued and ongoing risk to their Private Information, as the exposed Private Information can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting and marketing.

18. Plaintiff, on behalf of herself and all others similarly situated, now asserts claims under the federal Electronic Communications Privacy Act ("ECPA"), the Illinois Eavesdropping Statute, and Illinois common law, seeking damages and an injunction to stop this unlawful data sharing.

**PARTIES**

19. Plaintiff Pamela Kizior is a resident of Berwyn, Illinois. Plaintiff has health insurance through BCBSIL.

20. HCSC is a mutual legal reserve company formed under the laws of Illinois with its headquarters in Chicago, Illinois. BCBSIL is a division of HCSC.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises, in part, under the laws of the United States. This Court has supplemental

jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are based on a common nucleus of operative facts (i.e., the exact same tracking technologies and disclosures), and form part of the same case or controversy, as Plaintiff's claims under federal law.

22. This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

23. Venue is proper under 28 U.S.C § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### *A. Background on Web Browsers/Applications & Tracking Technologies.*

24. Web browsers and mobile applications are software applications that allow consumers to exchange electronic communications over the internet.

25. Every website/application is hosted by a computer server through which the entity in charge of the website/application exchanges communications with internet users via their browser/application.

26. Internet users use web browsers and mobile applications to send, receive, and view electronic communications on the internet.

27. The communications between a user and a website begin when the user arrives at the intended website. The communications continue as the user navigates the website. The communications end when the user closes their browser or goes to an unrelated website. Communications restart if a user returns to the website.

28. When an individual uses a web browser to navigate to a website, a number of

communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following content:

a) *A "GET request" and "POST request" sent from the user's computer to the website server, and a responsive "HTTP response" request sent from the website server to the user's computer.* When an individual internet user visits a web page, his or her web browser sends a message called a "GET request" to the webpage's server. The GET request tells the website what information is being requested and then instructs the website to send the information back to the web browser on the user's computer, which the website does via a responsive "HTTP response" sent to the user's web browser. The GET and POST requests and HTTP response include the content the user requested the website to display.

b) *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontent).

c) *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the Internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d) *Information on the User Agent*. A user agent is the hardware and/or software

responsible for retrieving the requested content, such as the device, operating system and web browser.

e) *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

29. Mobile applications function similarly. They are hosted by a server (often the same server that hosts the website), and exchange GET and POST requests and HTTP responses with the application communicating with the server. The communications also include an identifier of the requested content, user IP address, user agent data, and a timestamp.

30. In addition to exchanging the above communications with users' devices, websites and applications can also cause tracking technologies to be installed on the accessing users' device.

31. In the context of websites, tracking technologies are often referred to as "cookies," "beacons" or "pixels," and, if the website owner has embedded those technologies into the website, they are transmitted by the web server to the accessing user's computer when the user navigates to the web page containing the technology. Once they begin operating on the user's computer, they intercept the portions of the user's communications with the website that the technology is configured to collect and transmit that information to the third-party tracking technology vendor alongside one or more unique identifiers associated with the user.

32. In the context of mobile applications, tracking technologies are often referred to as "software development kits" ("SDK") or "application programming interfaces" ("API"). An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives

insight into user behavior, engagement, and cross-network attribution."[3] APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[4] "[A]n SDK often contains at least one API."[5] If the application owner has embedded these technologies into an application, they are sent to the user's device with the application software (or update) and thereafter intercept the portions of the user's communications with the server that the technology is configured to collect, and transmit that information to the third-party tracking technology vendor alongside one or more unique identifiers associated with the user.

33. Tracking technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc.), gathering data on the user's online activity in real time, and transmitting that data to the third-party technology vendor. Two of the primary reasons website/application operators use these technologies are to: (1) track user's activity on a website or application; (2) enable the website/application host to subsequently serve the individual user with targeted advertising across the internet.

34. Tracking technologies intercept online communications on the user's device—where the tracking technology was sent and operates—at the same time that the communication is occurring with the host server. Thus, tracking technologies intercept the communications on the user's device (*e.g.*, web browser or application) in real time, while the user is actively communicating with the website/application.

---

[3] API VS. SDK: THE DIFFERENCE EXPLAINED, https://getstream.io/glossary/api-vs-sdk/.

[4] APPLICATION PROGRAMMING INTERFACE (API), IBM, https://www.ibm.com/cloud/learn/api.

[5] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM, https://www.ibm.com/blog/sdk-vs-api/

35. Tracking technologies are configured by the operator of the website/application to collect specific aspects of the communication between the user and server (and not the entire content of *e.g.*, a particular webpage). To achieve this end, tracking technologies read the entire contents of the communication with the host website and collect the parts of the communication that they are configured to collect (*e.g.*, the GET/POST requests, URL, IP address, user-agent information, etc.). The relevant parts of the communication are then transmitted from the user's device to the tracking technology vendors' servers, where it is stored, analyzed and used for *e.g.*, creating detailed individual profiles to facilitate targeted advertising.

36. The communications transmitted to the third-party tracking technology vendors contain the information described above, including, e.g., the GET/POST requests, the URL of the requested information (or URL-like location data requested by applications), IP address, user-agent data, and, in some cases, precise geolocation data on the user. This information is bundled with one or more unique identifiers associated with the user so that the intercepted communications can be associated with that user on a going-forward basis to *e.g.*, build a targeted marketing profile based on their online activity.

37. Once the third-party tracking technology vendor collects the information contained in the users' communications with the host server, the third-party can store and use the information for its own purposes, including pecuniary purposes and the facilitation of targeted advertising for the third-party's marketing clients.

38. Tracking technologies effectively open a spying window through which the tracking technologies funnel data about users and their communications with the host website/application to third parties in real time from the user's browser or device. It is akin to placing a bug at the point of origin of a call, which causes the communication with the intended

recipient, in this case BCBSIL, to be simultaneously, contemporaneously, live, and in real time transmitted to the tracking technology providers.

39. On a technical level, that is how the tracking technologies on the BCBSIL Online Platform were deployed to intercept Plaintiff's and the Class's communications with Defendant.

### *B. How Defendant Discloses Class Members' Protected Health Information and Enables Intercepting Communications.*

40. HCSC maintains the web property www.bcbsil.com, and the related BCBSIL application, for its health plan members to communicate with HCSC.

41. HCSC actively encourages plan members to use the BCBSIL Online Platform to access and manage plan benefits, including, for example, to review and manage claims for medical coverage.

42. Unbeknownst to Plaintiff and other BCBSIL plan members, Defendant embedded tracking technologies on the BCBSIL Online Platform that intercepted plan members' communications with Defendant, which included PHI, and transmitted that information to various third-party tracking technology vendors.

43. One suite of tracking technologies that Defendant embedded on the BCBSIL Online Platform was a set of tracking technologies created by third-party Adobe.

44. Adobe has created a vast system that uses tracking technologies and unique user identifiers to track and profile individuals based on their private web activity across the Internet and inside mobile apps.

45. The motive behind Adobe's surveillance network is simple: to amass data that it can use to sell targeted ads.

46. The anchor for Adobe's entire advertising business is its "identity graph"—i.e., the collection of profiles compiled about individuals that aggregate personally identifiable information

against unique identifiers that Adobe ties to a specific individual.

47. The touchstone of Adobe's identity graph is a proprietary identifier called the Experience Cloud Identifier or "ECID" (a/k/a "mid"). Adobe creates and assigns an ECID to each individual that comes into contact with its tracking technology. As users visit web properties—whether through a browser or mobile app—Adobe looks up the user to find the corresponding ECID and records their communications with those services to aggregate them back to the same identity profile using the assigned ECID.

48. Adobe's technology is also designed to circumvent browser-based tracking protections. Many modern browsers, such as Apple's Safari, attempt to prevent online tracking by blocking "third-party cookies." While "cookies" (small text files placed by a web server on a computer or mobile device) are commonly used by website operators, third-party cookies (placed by someone other than the website operator) exist almost exclusively for tracking and marketing. As a workaround, Adobe developed an obscure scheme to conceal the origin of its cookies so they appear to originate from the website operator's first-party code rather than a third party, thereby evading browser privacy controls.

49. Adobe maintains a comprehensive suite of surveillance technologies deployed through its Experience Cloud, which continually feed its advertising systems. These products systematically enhance Adobe's identity graph by intercepting private communications, collecting identifying information, and adding it to user profiles across the internet.

50. To complement its cookies and identifiers, Adobe launched the Adobe Experience Platform Identity Service to maintain tracking continuity when a user logs in across multiple devices (e.g., switching from a mobile phone to a laptop). Through its "Identity Graph Generator," Adobe links disparate identifiers to associate all known activity with the single corresponding

individual. Adobe actively markets this solution by emphasizing its ability to identify the "people behind the devices."

51. Defendant embedded numerous tracking technologies offered by Adobe into the BCBSIL Online Platform, including Adobe Analytics (used for behavioral measurement), Adobe Audience Manager (used for advertising and cross-site identification), Adobe Everest (used for advertising and identification sync), Adobe Target (used for content personalization / targeting), and Adobe Helix RUM (real-user monitoring). Collectively, these tracking technologies transmit to Adobe: (1) page paths requested and visited on the BCBSIL Online Platform (e.g., the URL); (2) BCBSIL member number; (3) Illinois Medicaid status; (4) claims information; (5) IP address; (6) device fingerprinting information (e.g., user-agent information like device model, platform, screen size, exact browser build, etc.); and (7) unique identifiers assigned to the user (*e.g.*, the ECID and those identifiers carried by the Adobe "Demdex" and "Adobe Marketing Cloud ID" technologies) that function as cross-site marketing identifiers and that allow Adobe to perform a user identification sync. Certain of this information is personally identifying in isolation (e.g., the BCBSIL member number), but, as discussed in more detail above, Adobe can use the unique numerical identifiers to single out and re-identify a user.

52. Defendant also embedded other tracking technologies offered by various third-parties into its Online Platform.

a) **Dynatrace**. Defendant embedded a tracking technology offered by third-party Dynatrace into the BCBSIL Online Platform, which, among other things, operates as a digital experience monitor that combines real-user tracking and synthetic tests to measure how end-users experience web and mobile applications. This technology transmits to Dynatrace: (1) requests to log into

the patient portal and the results of those requests; (2) page paths visited on the BCBSIL Online Platform; (3) BCBSIL member number; (4) IP address, (5) device fingerprinting information; and (6) a unique identifier referred to as a Dynatrace visitor ID, which, combined with the IP address and fingerprinting data, can be used to re-identify the individual user. The Dynatrace technology also syncs with other third-party data transmissions (*e.g.*, the transmissions to Adobe) to allow the same visit to be correlated across vendors, compounding identifiability.

b) **Medallia**. Defendant embedded a technology offered by third-party Medallia into the BCBSIL Online Platform, which, among other things, operates as a digital experience and behavior events monitor. This technology transmits to Medallia: (1) page paths visited; (2) IP address; (3) device fingerprinting information; and (4) a unique identifier referred to as a Medallia user ID, which, combined with the IP address and fingerprinting data, can be used to re-identify the individual user.

c) **Qualtrics**. Defendant embedded a technology offered by third-party Qualtrics into the BCBSIL Online Platform. Qualtrics is a cloud-based software platform used to create, distribute, and analyze online surveys to track brand perception and conduct market research. The technology transmits to Qualtrics: (1) page paths visited; (2) indications the user has Medicaid and the particular plan; (3) IP address; and (4) precise geolocation data. The combination of IP address and precise geolocation data is sufficient to narrow the user to a particular household.

53. Collectively, this information reveals to the third-party tracking technology vendors: (a) information sufficient to identify or re-identify the individual user; (b) that the user is a BCBSIL plan member; (c) whether the user is enrolled in an Illinois Medicaid plan and the type of plan; (d) types of benefits accessed by the user on the BCBSIL Online Platform (*e.g.*, a claim ID, claims/detail, preauth-referrals, spending-accounts).

54. For example, when a user logs into the patient portal, the authentication request is intercepted and disclosed to the third-party tracking technology vendors. When a user successfully authenticates into the portal, and thereafter accesses content within the portal, the in-portal page paths requested are intercepted and disclosed to the third-party tracking technology vendors. This information reveals that the user is a BCBSIL plan member.

55. Further, many of the third-party tracking technology vendors intercept communications that reveal whether the user is or is not enrolled in Illinois Medicaid. The tracking technologies are configured to process this information differently, with some using it to populate a standalone data field (*e.g.*, "Medicaid=true") within the disclosure to the third-party vendor, and other technologies capturing page paths containing reference to the plan member's Medicaid status.

56. As an example of the disclosure of specific plan benefits, the BCBSIL Online Portal allows plan members to search for in-network medical providers that fit their specific medical needs. As the user refines their search parameters by *e.g.*, location, specialty and key words, that information is included in the requested page path (*e.g.*, URL.com/search/[key-words-entered-by-user]/network_id[#]/geo_location=[latitude/longitude]). The tracking technology vendors intercept those communications and thus obtain the details of the user's search for care. This information reveals the types of medical services the plan member is requesting on the patient

portal.

57. All of this information: (a) allows users to be assembled into profiles and audience segments (*e.g.*, Illinois residents on Medicaid or private health plans) usable for cross-sell and targeted marketing across other sites and applications; and (b) can be aggregated into individual profiles that carry independent marketing value.

58. These interceptions and disclosures are not required or necessary for the BCBSIL Online Platform to function, and many websites and applications can and do function without use of these technologies.

59. Plaintiff's and Class Members' identities could be determined based on the BCBSIL member number, device fingerprinting information, IP address, geolocation data, and/or unique numerical identifiers that were disclosed.

60. Through the tracking technologies, Defendant shares its plan members' identities and information related to their private medical treatment. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of plan members.[6]

61. By installing and implementing the Tracking Technologies, Defendant caused Plaintiff's and Class Members' communications to be intercepted and transmitted to the tracking technology vendors via the tracking technologies.

62. Defendant's conduct was knowing and intentional. Upon information and belief, the third-party vendors disclosed the Tracking Technologies' functionality to Defendant prior to Defendant's decision to embed the technologies on the BCBSIL Online Platform. Indeed, each of the tracking technologies is provided pursuant to an agreement that discusses its functionality, and, moreover, Defendant is a large company with a dedicated IT staff that must know what

[6] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Aug. 21, 2026).

technologies they are putting on the BCBSIL Online Platform and how those technologies function.

63. Class members, including Plaintiff, did not consent or authorize these interceptions and disclosures. Indeed, all of these transmissions are hidden from the plan member, and the plan member only sees the rendered page or portion of the BCBSIL Online Platform, without an indication of third-party interception or disclosure.

64. By law, Plaintiff and Class Members are entitled to privacy in their protected health information and confidential communications. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to the tracking technology vendors – unauthorized third-party eavesdroppers; and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

65. Because the tracking technologies are surreptitiously installed on users' devices without consent, and operate in the code running in the background on users' devices, Plaintiff did not discover that Defendant disclosed her personally identifiable information and protected health information to the tracking technology vendors, and assisted those third-parties with intercepting her communications with Defendant, until shortly before the Complaint was filed.

***C. Defendant Violated HIPAA And Duties Owed Thereunder.***

66. Plan member health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

67. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part

164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[7]

68. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

69. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

70. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
***

---

[7] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

H. Medical record numbers;
I. Health plan beneficiary numbers;
J. Account numbers;
***
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristic, or code…; and

(ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

71. In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on webpages, such as Defendant's use of the Tracking Technologies on its Websites and related subpages.[8] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[9]

72. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans like Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

73. Whenever a third-party creates, receives, maintains, or transmits PHI on behalf of

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (rev. Mar. 18, 2024) ("HHS Privacy Bulletin").
[9] *Id.*

a covered entity to perform a function or service, the third-party and covered entity must have a HIPAA-compliant Business Associate Agreement. 45 C.F.R. §§ 164.502, 164.504.

74. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the person obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

75. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

### *i. Plan member status is among the health information protected by HIPAA*

76. An individual's status as a plan member is protected by HIPAA.

77. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care

provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI.[10]

78. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients or enrollees to third parties* without obtaining authorization from each person on the list. (Emphasis added).[11]

79. The instructions continue:

> For example, it is "marketing" when: . . . A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

80. HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a) "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b) "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere status with the covered entity, 67 Fed. Reg. 53186 (Aug. 14, 2002), such a patient or plan member list;

c) It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed.

---

[10] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 21, 2026).

[11] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 21, 2026).

Reg. 5642 (Jan. 25, 2013).

### *ii. The Use Of PHI For Marketing, Including On The Internet, Is Prohibited Absent Informed Consent.*

81. Pursuant to 45 C.F.R. § 164.508(a)(3), "a covered entity ***must*** obtain an authorization for any use or disclosure of protected health information for marketing" other than face-to-face communications between the covered entity and individual or promotional gifts.

82. HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans, and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[12]

83. In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans', use of tracking technologies like the tracking technologies at issue here. Among other things, HHS explained that covered entities, such as health plans, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information

[12] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[13]

84. Tracking technology vendors like those at issue here are considered business associates under HIPAA if they provide services to the health plan and receive or maintain PHI:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[14]

85. HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Tracking on user-authenticated webpages

[13] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (rev. Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[14] *Id*.

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[15]

86. The Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

***iii. Internet Cookies Are Personally Identifiable***

87. In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

88. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a

[15] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (rev. Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphases added.)

user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

89. Cookies are designed to and, in fact, most often do operate as a means of identification for internet users.

90. Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

91. Defendant improperly disclosed cookies along with Private Information, including cookies that contained the user's BCBSIL member number and various other unique numerical identifiers.

***iv. IP Addresses are Personally Identifiable Information.***

92. In addition to plan member status, URLs and other page paths related to the user's use of the portal (and *e.g.*, efforts to find an in-network provider fitting the user's medical needs), and other identifiers, Defendant improperly disclosed plan members' computer IP addresses to the tracking technology vendors.

93. An IP address is a number that identifies the address of a device connected to the internet.

94. IP addresses are used to identify and route communications on the internet.

95. IP addresses of individual internet users are used by internet service providers, websites, applications and third-party tracking companies to facilitate and track internet communications.

96. Under HIPAA, an IP address is considered personally identifiable information:

a. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

97. Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the medical provider.[16]

98. Consequently, Defendant's disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

***D. Defendant's HIPAA Notice Of Privacy Practices & Promises***

99. Defendant publishes a HIPAA Notice of Privacy Practices ("HIPAA Notice").

100. Defendant's HIPAA Notice states that "Blue Cross and Blue Shield of Illinois (BCBSIL) is committed to protecting your privacy and understands the importance of safeguarding medical information. We are required by the Health Insurance Portability and Accountability Act (HIPAA) to maintain the privacy of your protected health information (PHI) that identifies you or could be used to identify you."

101. Defendant's HIPAA Notice states that: "**We cannot use or disclose PHI for these**

---

[16] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (rev. Mar. 18, 2024)

**purposes without your written consent** … To conduct marketing or for our financial benefit."

102. Defendant's HIPAA Notice of Privacy Practices does ***not*** permit Defendant to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes, or for Defendant's financial benefit, absent the informed written consent of each affected plan member.

103. Defendant's marketing and assurances that it will keep plan members' Private Information confidential and secure are false.

104. Defendant violated its own HIPAA Notice by unlawfully facilitating the interception and disclosure of Plaintiff's and Class Members' Private Information to the tracking technology vendors without acquiring the specific plan members' consent or authorization to share the Private Information.

***E. Plaintiff's & Class Members' Expectation of Privacy.***

105. At all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

106. Plan members are aware of their health plan's duty of confidentiality, and, as a result, have an objectively reasonable expectation that their health plans will not share their personally identifiable data and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to the plan member's care.

107. Defendant's surreptitious disclosure and interception of Plaintiff's and Class members' private communications, including PII, health information, and other sensitive data, violates Plaintiff's and Class members' expectation of privacy.

***F. Plaintiff's and Class members' Private Information has economic value.***

108. Defendant and the Tracking Technology Vendors that Defendant uses profit from their use of Plaintiff's and Class members' personal data to target them with advertising and for other economic benefits, such as improving their online platforms and advertising efficiency.

109. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[17] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[18] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

110. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[19] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[20]

111. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshana Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed

---

[17] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[18] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[19] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf

[20] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

their business models from fee for services provided to customers to monetizing their users' data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[21] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

112. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[22]

113. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and former principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[23]

114. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her

---

[21] Shoshana Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).
[22] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).
[23] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[24]

115. The cash value of the personal user information unlawfully collected by Defendant during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[25] Web browsing histories were valued at $52.00 per year.




116. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add

[24] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[25] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $5 per week to be tracked.

117. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-eight percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

118. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

119. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

c. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[26]

d. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[27]

e. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[28]

f. Killi is a new data exchange platform that allows you to own and earn from your data.[29]

g. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[30]

h. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone,

---

[26] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable *(sic)* by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[27] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[28] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[29] https://killi.io/earn/.

[30] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and you earn points worth up to $50 per month.[31]

120. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[32]

121. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" as more valuable than any other piece of data about them, with a minimum value of $59.80.[33]

122. Medical information derived from medical providers garners even more value from the fact that it is not available to third party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and health plan standards.

123. Even with restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[34]

---

[31] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[32] Kari Paul, *Facebook launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounounciations-ap.

[33] *See* Ponemon Institute, Privacy and Security in a Connected Life: A Study of US Consumers, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

[34] *See* Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (February 1, 2016); Sam Thielman, *Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions, The Guardian*, https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns (January 10, 2017); Adam Tanner, *The Hidden Global Trade in Patient Medical Data*, YaleGlobal Online, https://archive-yaleglobal.yale.edu/content/hidden-global-trade-patient-medical-data (last visited Sept. 1, 2026).

124. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiff and Class members have a vested property right in their individually identifiable health information.

125. Illinois courts have described property broadly:

i. "Property consists of certain rights in things secured by law. These rights are usually defined to be the right of user, the right of exclusion, and the right of disposition. In a strict sense, land is not property, but the subject of property." *Rigney v. City of Chicago*, 102 Ill. 64 (1881).

j. "Property is the right and interest which one has in lands and chattels to the exclusion of others. The term 'property' includes every species of valuable right and interest. Value is the price deemed or accepted as equivalent to the utility of anything, and compensation is that which constitutes or is regarded as an equivalent. It is impossible to conceive of a thing such as property wholly separated from the element of value. From the very term 'property' the law infers some value; and, if no value is shown, the inference will be that it is the nominal sum of one cent, one penny, or one dollar." *Illinois Cent. R. Co. v. Commissioners of Highways and Town of Mattoon*, 161 Ill. 247, 251 (1896).

126. The United States Supreme Court has explained that, "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 27. There is no doubt that Defendant has a "property right" in plan member data such that, if Adobe, Medallia, Qualtrics, and Dynatrace took such information from

Defendant without authorization, Defendant would have a claim for Adobe, Medallia, Qualtrics, and Dynatrace's taking of their property. Plan members also have a property right in their own health information that may not be taken or used by Defendant without their authorization for non-health care related reasons.

127. Federal and state law grant plan members the right to protect the confidentiality of data that identifies them as plan members of a particular health care provider and restrict the use of their health data, including their status as a plan member, to only uses related to their care or otherwise authorized by federal or state law in the absence of plan member authorization.

128. A plan member's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

129. In addition to property rights in their health data, plan members enjoy property rights in the privacy of their health communications.

130. Plan member property rights in their health data and communications are established by HIPAA and state health privacy laws that are equally or more stringent than HIPAA.

131. American courts have long recognized common law property rights in the content of a person's communications that are not to be used or disclosed to others without authorization.

132. Property rights in communications and information privacy are established by:

a) The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act);

b) State laws that establish a right to keep communications confidential; and

c) Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to

exist. *See Folsom v. Marsh*, 9 F. Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J.); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811).

133. Defendant's unauthorized acquisition, use, and disclosure of Plaintiff' and Class members' individually identifiable health information for marketing purposes violated their property rights to control how their health data and communications are used and who may be the beneficiaries of their data and communications.

134. Plaintiff and class members seek to recover the value of the unauthorized access to their Private Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

135. Defendant does not provide its services for free. All BCBSIL plan members,

including Plaintiff, pay Defendant consideration either directly or indirectly (e.g., premiums, cost-sharing, employer contributions, etc). When Defendant purports to provide its plan members with a modern, convenient and secure means of obtaining its services, including accessing its in-network provider list, that is an integral part of the services that Defendant provides that has real value. When Defendant failed to follow through in providing the promised level of privacy and security, BCBSIL plan members (including Plaintiff) did not receive the full benefit of the bargain that they struck with Defendant when they gave consideration for their services. Indeed, the bargain included health insurance *without* the additional consideration of providing plan member PHI to third-parties to enhance Defendant's marketing.

136. In the modern economy, consumers pay for services with more than money.

137. On the Internet, consumers often pay for services by granting the company with which they are engaged a license to collect and use their personal data for marketing purposes.

138. Although increasing in prevalence due to the Internet, there is nothing novel about such arrangements. Bartering occurred prior to the invention of currency. The exchange of a data license for use of a service is a modern-day bartering arrangement.

139. Thus, although certain services do not involve the payment of money, they are not free. Consumers pay for the services by giving a license to use their data instead.

140. The right to collect and use consumer data is valuable and monetizable—by companies and consumers. This is particularly true of health information.

141. On the surface, the price of Defendant's health care services includes the consideration that users gave to Defendant. But what Defendant failed to disclose to plan members is that it was also granting itself a license to collect, disclose to third-parties, and use their health information for Defendant's own benefit, including for marketing purposes.

142. In signing up to become a BCBSIL plan member, Plaintiff and Class members granted Defendant a license to use their information and communications that was limited to the purposes listed in the HIPAA Notice. As described herein, that disclosure does not extend to the disclosure of their protected health information for marketing purposes or for Defendant's financial gain. Thus, the limits of the data license that Defendant obtains in order to provide health services to plan members are prescribed by the HIPAA Notice and did not include using, disclosing, or selling plan member information for marketing purposes or for Defendant's financial gain.

143. Defendant overcharged plan members by granting itself a license to use and disclose valuable plan member health data beyond the license and limitations specifically stated in the HIPAA Notice.

144. The "data license" overcharge that Defendant collects, uses, and shares for marketing purposes without authorization has monetary value. For example, a 2015 study found respondents placed a value of $59.80 on health information.

145. In addition, some companies sell de-identified health information in the open market. For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified patients."

146. Because Americans typically do not want to sell their personal health information for any purpose and it is illegal to even share such information without express, written authorization, there are fewer open markets for a license to collect or sell personal health information for non-health purposes than other types of data. However, black markets do exist for such data. It has been reported that health data can be "more expensive than stolen credit card numbers" on black markets.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCES

147. Plaintiff Kizior is a BCBSIL plan member and has been since November 2025.

148. As a condition of using Defendant's services, Plaintiff Kizior disclosed her Private Information to Defendant.

149. On multiple occasions during the time period she has been a BCBSIL plan member, Plaintiff Kizior logged into the BCBSIL Online Platform from her browser on her computer and through Defendant's application on her phone and was authenticated as a plan member and accessed Defendant's BCBSIL Online Platform to review claim details, aspects of her plan design, and her spending under that plan.

150. Via the tracking technologies Defendant embedded on the BCBSIL Online Portal, Defendant transmitted to the Tracking Technology Vendors Plaintiff Kizior's computer IP address, unique identifiers, user-agent data, timestamp, geolocation, insurance network, aspects of her plan design, her status as a BCBS plan member, including her BCBSIL member number, her status as a Medicaid recipient, and the frequency and timing of her access to her authenticated account.

151. This information was protected under HIPAA, including because it revealed Plaintiff's status as a BCBSIL plan member, her BCBSIL member number, her status as a Medicaid recipient and, further, that she was communicating with Defendant that she was reviewing her claim details and spending.

152. Plaintiff Kizior reasonably expected that her communications with Defendant via the BCBSIL Online Platform were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party for marketing (or any other) purpose.

153. Plaintiff Kizior provided her Private Information to Defendant and trusted that the

information would be safeguarded according to Defendant's policies and state and federal law.

154. As described herein, Defendant worked along with the Tracking Technology Vendors to intercept Plaintiff Kizior's communications, including those that contained Private and confidential information.

155. Defendant willfully facilitated these interceptions without Plaintiff Kizior's knowledge, consent or express written authorization.

156. Plaintiff Kizior did not consent or otherwise provide express written authorization to Defendant to transmit to the Tracking Technology Vendors her Private Information.

157. By doing so without her consent, Defendant breached Plaintiff Kizior's right to privacy and unlawfully disclosed Plaintiff Kizior's Private Information.

158. Plaintiff Kizior suffered injuries and damages in, *inter alia*, the form of (i) invasion of privacy / intrusion upon her seclusion; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) violation of her legal rights and statutory damages; and (v) the continued and ongoing risk to her Private Information.

159. Plaintiff Kizior has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiff Kizior anticipates needing to use the BCBSIL Online Platform to manage her plan benefits in the future.

**CLASS ACTION ALLEGATIONS**

160. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

161. The Class that Plaintiff seeks to represent is defined as follows:

> **All individuals residing in the State of Illinois whose Private Information was disclosed to a third party without authorization or consent through the tracking technologies on the BCBSIL Online Platform.**

162. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

163. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

164. Numerosity, Fed R. Civ. P. 23(a)(1). The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over a million individuals whose PII and PHI may have been improperly accessed by the Tracking Technology Vendors, and the Class is identifiable within Defendant's records.

165. Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a) Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant violated its HIPAA Notice of Privacy Practices by disclosing the PII and PHI of Plaintiff and Class Members to Adobe, Medallia, Qualtrics, and Dynatrace, and/or additional third parties;

d) Whether Defendant adequately, promptly and accurately informed Plaintiff

and Class Members that their PII and PHI would be disclosed to third parties;

e) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f) Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h) Whether Defendant violated the statutes invoked herein;

i) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j) Whether Defendant knowingly made false representations in its HIPAA Notice of Privacy Practices;

k) Whether Defendant knowingly omitted material representations with respect to its HIPAA Notice of Privacy Practices; and

l) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

166. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of the Tracking Technologies, due to Defendant's misfeasance.

167. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest

that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

168. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Defendant, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

169. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

170. The nature of this action and the nature of laws available to Plaintiff and Class

Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

171. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

172. Ascertainability & Notice. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

173. Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2). Unless a Class-wide injunction is issued, Defendant will continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the

Federal Rules of Civil Procedure.

174. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b) Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's HIPAA Notice of Privacy Practices;

c) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g) Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I.**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510 *et seq*.**
**On Behalf of Plaintiff and the Class**

175. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

176. The ECPA protects both the sending and receipt of communications.

177. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

178. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

179. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

180. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

181. "Contents" includes "any information relating to the substance, purport, or

meaning" of the communication at issue. 18 U.S.C. § 2510(8).

182. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

183. Plaintiff and Class members' communications with Defendant via the BCBSIL Online Platform are electronic communications under the ECPA.

184. Whenever Plaintiff and Class members interacted with Defendant's BCBSIL Online Platform, Defendant, through the tracking technologies it embedded and ran on its BCBSIL Online Platform, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class members' electronic communications without authorization or consent.

185. Whenever Plaintiff and Class members interacted with Defendant's BCBSIL Online Platform, Defendant, through the tracking technologies it embedded and ran on its BCBSIL Online Platform, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class members' electronic communications to third parties, including Adobe, Medallia, Qualtrics, and Dynatrace, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

186. Whenever Plaintiff and Class members interacted with Defendant's BCBSIL Online Platform Defendant, through the tracking technologies it embedded and ran on its BCBSIL Online Platform, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class members' electronic communications, for purposes other than providing health care services to Plaintiff and Class members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

187. Whenever Plaintiff and Class members interacted with Defendant's BCBSIL

Online Platform Defendant, through the tracking technologies it embedded and ran on its BCBSIL Online Platform, contemporaneously and intentionally redirected the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Adobe, Medallia, Qualtrics, and Dynatrace.

188. Defendant intentionally intercepted and used the contents of Plaintiff's and Plan member Class members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiff's and Class members' communications by disclosing the contents to third party marketing and analytics companies.

189. Plaintiff and Class members did not authorize Defendant to disclose the content of their communications for those purposes.

190. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

191. Defendant is a "party to the communication" with respect to plan member communications.

192. Defendant's acquisition of plan member communications that were used and disclosed to Adobe, Medallia, Qualtrics, and Dynatrace, and others was done for purposes of committing acts that were criminal and/or tortious, including acts that violated:

a) HIPAA, 42 U.S.C. § 1320d-6; and

b) Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51.

193. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health

information to another person … without authorization" from the plan member.

194. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

195. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a) Used and caused to be used cookies associated with specific plan members—including the cookies discussed above—without plan member authorization;

b) Disclosed individually identifiable health information to Adobe, Medallia, Qualtrics, and Dynatrace, and others.

196. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Adobe, Medallia, Qualtrics, and Dynatrace tracking technologies was for Defendant's commercial advantage to increase revenue from existing plan members and gain new plan members.

197. The Illinois Computer Crime Prevention Law ("ICCPL") prohibits "computer tampering," and provides a private right of action for whoever "suffers loss by reason of a violation of subdivision (a)(4)." 720 ILCS 5/17-51(c).

198. Subdivision (a)(4) of the ICCPL provides: a) A person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her: … (4) Inserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may… (b) alter, delete, or remove … data from that computer; or (c) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program…

199. Defendant violated the ICCPL when it knowingly and without Plaintiff's or Class members' authorization inserted the tracking technologies discussed herein on their computing devices.

200. The tracking technologies, which constitute programs, commanded Plaintiff's and Class members' computing devices to remove and redirect their data and the content of their communications with Defendant to Adobe, Medallia, Qualtrics, and Dynatrace, and others.

201. Defendant knew or had reason to know that the tracking technologies would command Plaintiff's and Class members' computing devices to remove and redirect their data and the content of their communications with Defendant to Adobe, Medallia, Qualtrics, and Dynatrace, and others.

202. Defendant knew or had reason to know that its use of the tracking technologies would cause Plaintiff and Class members to suffer a loss, including:

a) Taking valuable data from Plaintiff and Class members without compensation;

b) Plaintiff's and Class members' inability to use their computing devices for the purpose of privately communicating with their health insurer;

c) The loss of privacy due to Defendant making sensitive and confidential information Plaintiff and Class members intended to remain private no longer private;

d) Defendant took something of value from Plaintiff and Class members and derived benefits therefrom without Plaintiff's and Class members' knowledge or informed consent and without sharing the benefit of such value; and

e) The diminution in value of Plaintiff's and Class members' data.

203. Plaintiff, individually and on behalf of the Class members, seeks all monetary and

non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II.**
**VIOLATION OF THE ILLINOIS EAVESDROPPING STATUTE**
**720 ILCS § 5/14-1, *et seq.***
**On Behalf of Plaintiff and the Class**

204. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, *et seq*., prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person subjected to a violation of the IES against eavesdroppers and their principals.

205. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

206. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

207. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possess[] any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

208. The IES defines "private electronic communication" as "any transfer of signs,

signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

209. "Surreptitious," as used in the IES, "means obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

210. An "eavesdropper" means "any person…who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).

211. A "principal" includes any person who "[k]nowingly derives any benefit or information from the illegal use of an eavesdropping device by another." 720 ILCS § 5/14-1(c).

212. An "eavesdropping device" is "any device capable of being used to…intercept…electronic communications[.]" 720 ILCS § 5/14-1(a).

213. Plaintiff's communications with Defendant constituted private electronic communications. Plaintiff transmitted her communications to Defendant from her computers or by wire, intended the communications to be private, and reasonably expected the communications to be private under HIPAA, Defendant's express promises of confidentiality, the plan- member relationship, and other State and federal laws protecting the confidentiality of Plaintiff's communications.

214. Adobe, Medallia, Qualtrics, and Dynatrace were not parties to Plaintiff's private electronic communications with Defendant. Plaintiff believed she were only communicating with Defendant, intended for her communications to be directed at Defendant only, and was unaware of the presence of concealed tracking technologies that redirected her communications.

215. Adobe, Medallia, Qualtrics, and Dynatrace's interceptions of Plaintiff's private electronic communications were knowing, intentional, and surreptitious. Adobe, Medallia, Qualtrics, and Dynatrace intentionally designed their tracking technologies so that they could be concealed on websites and applications to secretly intercept private communications. On information and belief, Adobe, Medallia, Qualtrics, and Dynatrace knew that their tracking technologies were capable of, and in fact did, intercept private electronic communications without the consent of all parties to the communications.

216. Adobe, Medallia, Qualtrics, and Dynatrace used and disclosed Plaintiff's intercepted communications for advertising and other purposes.

217. Adobe, Medallia, Qualtrics, and Dynatrace's conduct was done without Plaintiff's consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

218. Defendant acted as Adobe, Medallia, Qualtrics, and Dynatrace's "principal" under the IES. By deploying the source code from Adobe, Medallia, Qualtrics, and Dynatrace on its web-property, Defendant directed that Adobe, Medallia, Qualtrics, and Dynatrace illegally eavesdrop on Plaintiff's private electronic communications on its behalf and Defendant knowingly derived benefits and information from the illegal eavesdropping in the form of enhanced marketing and higher margins.

219. Defendant further violated 720 ILCS § 5/14-2(a)(4) by possessing the source code, knowing that its design rendered it primarily useful for surreptitiously intercepting private electronic communications contrary to the IES.

220. Defendant's violation of the IES was wanton, reckless, and/or malicious.

221. For Defendant's violations of the IES, Plaintiff and Class members seek actual damages, punitive damages, injunctive relief, and any other relief the Court deems just.

**COUNT III**
**NEGLIGENCE**
**On Behalf of Plaintiff and the Class**

222. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

223. Under Illinois law, to state a negligence claim a plaintiff must plead that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries.

224. Illinois law recognizes that companies like Defendant who handle, collect, and otherwise manage non-public health information owe a duty to prevent the unauthorized disclosure of plan members' health information.

225. It was foreseeable to Defendant that deploying the tracking technologies identified above on the BCBSIL Online Platform would result in the plan members' PHI being shared with the third-party trackers. By deploying the tracking technologies identified above inside its member portal, Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and the Class Members' PHI.

226. Defendant also had a duty to notify Plaintiff and Class Members within a reasonable time frame of any breach to the confidentiality and security of their PHI. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by Defendant's conveyance of their PHI to the third-party trackers.

227. Defendant owed these duties to Plaintiff and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's deployment of the tracking

technologies identified above inside the BCBSIL Online Platform.

228. The risk that the applicable third-party trackers would access, exploit, and misuse Plaintiff's and Class Members' PHI was foreseeable. Given that Defendant holds vast amounts of PHI, Defendant was on notice of the need to protect Plaintiff's and Class Members' PHI from unauthorized disclosures via analytics technologies.

229. PHI is highly valuable, and Defendant knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiff's and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiff's and Class Members' PHI.

230. Defendant breached its duty of reasonable care to Plaintiff and Class Members in deploying the tracking technologies identified above on the BCBSIL Online Platform and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiff's and Class Members' PHI.

231. Defendant further breached its duty of reasonable care to Plaintiff and Class Members by sharing their PHI with the applicable third-party trackers, which actually and proximately caused injuries to Plaintiff and the Class Members.

232. Defendant also breached its duty of care by failing to provide reasonable and timely notice to Plaintiff and the Class Members that their PHI had been shared with the applicable third-party trackers, which actually and proximately caused additional injuries to Plaintiff and the Class Members.

233. As a direct and traceable result of Defendant's negligence, Plaintiff and Class Members have suffered injury and damages, including:(a) loss of privacy; (b) general damages for invasion of their privacy rights in an amount to be determined by a jury without reference to

specific pecuniary harm; (c) sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private; (d) Defendant eroded the essential confidential nature of the health insurer-plan member relationship; and (e) Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit.

234. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

235. As a consequence of Defendant's negligence, Plaintiff and Class Members have been harmed by losing control over their own PHI, which has now been shared with the applicable third-party trackers, with advertisers, and, upon information and belief, with online data brokers who buy, sell, and resell this information. One way for Plaintiff and Class Members to claw back the privacy of their PHI is to pay a data broker opt out service to go out into the marketplace and remove their PHI from data broker rolls. Such data broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and Optery for prices that range from $100 to $300 a year.

236. Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their PHI and were accordingly entitled to protection of this PHI against the acquisition and disclosure of their PHI by unreasonable means.

237. Defendant had notice and knew that its deployment of third-party trackers on its online portal, where Plaintiff and Class Members shared their PHI, would cause injury to Plaintiff

and Class Members.

238. The harm being suffered by Plaintiff and Class Members is ongoing because—as of the time of the filing of this complaint—Defendant continues to deploy tracking technologies on the BCBSIL Online Platform.

239. Plaintiff and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Defendant's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiff and Class Members. Accordingly, Plaintiff and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests relief against Defendant as set forth below:

a. Entry of an order certifying the proposed Class pursuant to the Federal Rules of Civil Procedure;

b. Entry of an order appointing Plaintiff as representative of the Class;

c. Entry of an order appointing Plaintiff's counsel as Class Counsel for the Class;

d. Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

   i. Enjoining Defendant, its affiliates, associates, officers, employees and agents from transmitting or disclosing Plaintiff's and Class members' Private Information to unauthorized third parties; and

   ii. Mandating that Defendant, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court

and counsel for the Plaintiff in the form of a declaration under oath that the above steps have been satisfied.

e. Enter judgment in favor of Plaintiff and each of the other Class members for damages suffered as a result of Defendant's conduct alleged herein, including compensatory, nominal, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f. Award Plaintiff her reasonable attorneys' fees and costs; and

g. Grant such other and further legal and equitable relief as the court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 1, 2026

DWOSKIN WASDIN LLP

*s/ Eric Dwoskin*

Eric S. Dwoskin (General Bar # 112459)
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorneys for Plaintiff and the putative Class*